1
2
3
4
5
6
7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    MICHAEL WARD,                          No.  2:24-cv-0978 TLN AC PS

12              Plaintiff,

13         v.                                 FINDINGS AND RECOMMENDATIONS

14    CITY OF REDDING, et al.,

15              Defendants.

16

17         Plaintiff is proceeding in this matter pro se, and pre-trial proceedings are accordingly

18   referred to the undersigned pursuant to Local Rule 302(c)(21).  Defendants move for dismissal of

19   the operative First Amended Complaint pursuant to Federal Rule of Civil Procedure Rule

20   12(b)(6); and/or Judgment on the Pleadings pursuant to Rule 12(c); and/or a More Definite

21   Statement pursuant to Rule 12(e); and/or to Strike pursuant to Rule 12(f).  ECF No. 15.  Plaintiff

22   opposed the motion.  ECF No. 17.  Defendant replied (ECF No. 18), and later submitted a request

23   for judicial notice of documents in support of the motion to dismiss.  ECF Nos. 19 (request), 20

24   (documents).  For the reasons that follow, the undersigned recommends the motion to dismiss be

25   GRANTED and that this case be closed.

26                              **I.  Background**

27         A.    The First Amended Complaint

28         Plaintiff's operative First Amended Complaint ("FAC") presents six putative causes of

1

action: (1) violation of the Tom Bane Civil Rights Act; (2) violation of the First Amendment right to videotape the police; (3) violation of the Fourth Amendment;  (4) violation of the Fifth Amendment right to remain silent; (5) race discrimination in violation of the Fourteenth Amendment; and (6) violation of the Americans with Disabilities Act and §504 of the Rehabilitation Act.  ECF No. 5 at 2-17.

Plaintiff's case arises out of a traffic stop that occurred on November 4, 2023, at approximately 8:00 p.m.  ECF No. 5 at 1.  Plaintiff was pulled over by Officer Dahnke, who informed plaintiff that he was being pulled over for driving without a front license plate.  ECF No. 5 at 6.  Plaintiff did have a front license plate.  Id.  According to the operative complaint, "Body Camera shows Officers Dahnke, and Upshaw suspiciously pulling Plaintiff over in a dark secluded area of Redding under a bridge next to a parking lot away from the general public, to keep from being recorded by bystanders" in a "calculated move."  Id.   "The Officers Body Camera video shows The following Officer Upshaw walking up to another officer (Unidentified) arriving on scene not being truthful with his fellow officer an African American cop from what it appears to be on video, audio recorded conversation between both, officer Upshaw stated 'He's pulling the race card, he says my partner and I are racially profiling him,' other officers African American 'He Black'?, Upshaw 'Yes'."  Id. at 6.  Plaintiff refused to identify himself to the officers, invoking his Fifth Amendment right to be silent.  Id. at 10.

One of the officers stated they believed plaintiff was Michael Smith from Maryland and that plaintiff was unlicensed because the vehicle identification number came back registered to a Michael Smith from Maryland, and that the officers were waiting on a photo because plaintiff wouldn't identify himself.  Id. at 6.  However, plaintiff contends that "Body Camera Footage audio can be heard between dispatch (SHASCOM-911) and Upshaw where SHASCOM 9-11 identified the plaintiff vehicle is registered to Michael M Ward . . . , registration current, insurance Valid, no active warrants, no probation, no criminal history."  Id. at 7.

Plaintiff alleges he attempted to invoke his First Amendment right to record the stop, but "video camera footage, and audio shows Officer Dahnke" telling plaintiff to turn off the phone and put it down.  Id. at 4.  Then, "documented on camera, the officers Byron Upshaw, Jacob

2

1    Gutrdig, and Chace Arnold forcefully participated knocking plaintiffs phone out of plaintiffs right

2    hand, breaking plaintiffs arm, with the intent to prevent plaintiff from ever being able to use that

3    arm again, using excessive force." Id. at 4-5.

4         Plaintiff alleges that "video, and audio evidence the Officer's Dahnke, Upshaw, Townelsy

5    are being witnessed Verbally threatened to use Excessive force beyond what is necessary on the

6    Plaintiff to pull him out of his vehicle, and placed the Plaintiff under false arrest instead of

7    simply asking the Plaintiff to step out, tum around, and to put his hands up" and that "Officer

8    Upshaw, who was caught on his own axon body camera video not being untruthful with his

9    supervisor about the true identity of the plaintiff, after the Plaintiff identified himself to both

10   officers by name as documented on body camera, after the officers identified the plaintiff Officer

11   Upshaw created a fictious suspects name, falsifying Plaintiffs identity to get other officers

12   involved in carrying out an unlawful arrest of the Plaintiff, this is done as a mechanism to cover

13   up the misconduct of both Upshaw, and Dahnke." Id. at 3.

14        During the interaction, "it is documented on video plaintiff's vehicle was completely shut

15   off, hands on the steering wheel recording the interaction with the supervisor, 10 minutes

16   past, video shows the supervisor opening Plaintiffs car door, as 4 cops rush plaintiffs vehicle

17   (swat style), using Excessive Force by participant Officers Upshaw, Chase Arnold, Guterding in

18   pulling the Plaintiff out of his vehicle[.]" Id. at 8. A supervising officer told plaintiff that he was

19   not being charged with any crime. Id. The officers then used flashlights to search plaintiff's

20   vehicle. Id. Plaintiff told the officers that they did not have his consent to search his vehicle. Id.

21   at 9. Plaintiff alleges "documented on video, and screenshot captured shows the same officer

22   Upshaw unlawfully seizing (theft of property) the Plaintiffs only car key, removing it from the

23   key chain that contained Plaintiffs house keys, and intentionally threw them onto the ground as

24   gathered as video evidence, the officer intentionally did perform this act out of malice, as a means

25   to deprive the Plaintiffs permanently of his vehicle during the time it was being unlawfully

26   impounded, and towed." Id. at 8-9.

27        Plaintiff alleges that "the officer (older Caucasian male) who assisted [Defendant] Dahnke

28   in booking the Plaintiff into Shasta county jail is on audio comparing the plaintiff to Jay-Z said

3

1    that I look like a famous gangster rapper, that is discriminative and prejudicial, because the

2    Plaintiff looks nothing like Jay-Z, Plaintiff is no rapper, nor is the Plaintiff affiliated with any

3    gangs." <u>Id.</u> at 11.

4          Plaintiff goes on to allege several separate interactions with Redding police officers.

5    Plaintiff alleges that on April 7, 2023, Redding officers followed him home and ran his license

6    plates, "until The officer did a U-turn . . . speeding off when the officer noticed I was recording

7    him or her." <u>Id.</u> at 14.  Plaintiff further alleges that on March 21, 2023, he was confronted by an

8    officer while getting gas, and plaintiff was asked to identify himself.  <u>Id.</u>  The officer refused to

9    identify himself to plaintiff.  <u>Id.</u>  Plaintiff next alleges that on January 17, 2024, he was followed

10   by Redding Police for 20 minutes before the officer quickly switched lanes and drove away.  <u>Id.</u>

11   at 15.  Plaintiff goes on to allege that on February 8, 2024, he was parked when two officers

12   approached a nearby white woman and asked the woman if plaintiff was trying to sell her drugs

13   or if he was harassing her, but the woman said she didn't know the plaintiff, and the police

14   ultimately left.  <u>Id.</u>

15                                    **II.  Analysis**

16         A.  <u>Legal Standards</u>

17              1.  <u>Rule 12, Fed. R. Civ. P.</u>

18         "The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal

19   sufficiency of the complaint."  <u>N. Star Int'l v. Ariz. Corp. Comm'n</u>, 720 F.2d 578, 581 (9th Cir.

20   1983).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of

21   sufficient facts alleged under a cognizable legal theory."  <u>Balistreri v. Pacifica Police Dep't.</u>, 901

22   F.2d 696, 699 (9th Cir. 1990).

23         In order to survive dismissal for failure to state a claim, a complaint must contain more

24   than a "formulaic recitation of the elements of a cause of action;" it must contain factual

25   allegations sufficient to "raise a right to relief above the speculative level."  <u>Bell Atlantic Corp. v.</u>

26   <u>Twombly</u>, 550 U.S. 544, 555 (2007).  It is insufficient for the pleading to contain a statement of

27   facts that "merely creates a suspicion" that the pleader might have a legally cognizable right of

28   action.  <u>Id.</u> (quoting 5 C. Wright & A. Miller, <u>Federal Practice and Procedure</u> § 1216, pp. 235-35

1  (3d ed. 2004)).  Rather, the complaint "must contain sufficient factual matter, accepted as true, to

2  'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

3  (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads

4  factual content that allows the court to draw the reasonable inference that the defendant is liable

5  for the misconduct alleged."  Id.

6       In reviewing a complaint under this standard, the court "must accept as true all of the

7  factual allegations contained in the complaint," construe those allegations in the light most

8  favorable to the plaintiff, and resolve all doubts in the plaintiff's favor.  See Erickson v. Pardus,

9  551 U.S. 89, 94 (2007); Von Saher v. Norton Simon Museum of Art at Pasadena, 592 F.3d 954,

10  960 (9th Cir. 2010), cert. denied, 564 U.S. 1037 (2011); Hebbe v. Pliler, 627 F.3d 338, 340 (9th

11  Cir. 2010).  However, the court need not accept as true legal conclusions cast in the form of

12  factual allegations, or allegations that contradict matters properly subject to judicial notice.  See

13  Western Mining Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981); Sprewell v. Golden State

14  Warriors, 266 F.3d 979, 988 (9th Cir.), as amended, 275 F.3d 1187 (2001).

15       Pro se pleadings are held to a less stringent standard than those drafted by lawyers.

16  Haines v. Kerner, 404 U.S. 519, 520 (1972).  Pro se complaints are construed liberally and may

17  only be dismissed if it appears beyond doubt that the plaintiff can prove no set of facts in support

18  of his claim which would entitle him to relief.  Nordstrom v. Ryan, 762 F.3d 903, 908 (9th Cir.

19  2014).  The court's liberal interpretation of a pro se complaint, however, may not supply essential

20  elements of the claim that were not pled.  Ivey v. Bd. of Regents of Univ. of Alaska, 673 F.2d

21  266, 268 (9th Cir. 1982); see also Pena v. Gardner, 976 F.2d 469, 471 (9th Cir. 1992).  A pro se

22  litigant is entitled to notice of the deficiencies in the complaint and an opportunity to amend,

23  unless the complaint's deficiencies could not be cured by amendment.  See Noll v. Carlson, 809

24  F.2d 1446, 1448 (9th Cir. 1987).

25       When ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), courts generally

26  may not consider material outside the pleadings.  Lee v. City of Los Angeles, 250 F.3d 668, 688

27  (9th Cir. 2001).  If "matters outside the pleading are presented to and not excluded by the court,"

28  the district court may convert the 12(b)(6) into a motion for summary judgment under Rule 56.

1   Fed. R. Civ. P. 12(d).  In that case, the court must first give both parties the opportunity "to

2   present all the material that is pertinent to the motion."  Id.  "There are two exceptions to this rule:

3   the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201."

4   Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th Cir. 2018).  These procedures

5   permit the court to consider extrinsic materials in determining whether plaintiff has stated a claim,

6   without converting the Rule 12 motion to one for summary judgment.  Id.

7              2.   Judicial Notice

8              Federal Rule of Evidence Rule 201 allows a court to notice an adjudicative fact if it is "not

9   subject to reasonable dispute."  Fed. R. Evid. 201(b).  A fact is "not subject to reasonable dispute"

10  if it is "generally known," or "can be accurately and readily determined from sources whose

11  accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(1)-(2).  Accordingly, "[a] court

12  may take judicial notice of matters of public record without converting a motion to dismiss into a

13  motion for summary judgment."  Lee, 250 F.3d at 689 (quotation marks and citation omitted).

14  The court may not, however, take judicial notice of disputed facts contained in such public

15  records.  Id.  When taking judicial notice, a court must specifically identify which facts it is

16  noticing, if any; "[j]ust because the document itself is susceptible to judicial notice does not mean

17  that every assertion of fact within that document is judicially noticeable for its truth."  Khoja, 899

18  F.3d at 999.

19              "Unlike rule-established judicial notice, incorporation-by-reference is a judicially created

20  doctrine that treats certain documents as though they are part of the complaint itself.  The doctrine

21  prevents plaintiffs from selecting only portions of documents that support their claims, while

22  omitting portions of those very documents that weaken—or doom—their claims."  Id. at 1002.

23  However, this doctrine does not apply to every external document mentioned within a complaint.

24  A document is subject to the incorporation by reference doctrine "if the plaintiff refers

25  extensively to the document or the document forms the basis of the plaintiff's claim."  Id. (citing

26  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003)).  "However, if the document merely

27  creates a defense to the well-pled allegations in the complaint, then that document did not

28  necessarily form the basis of the complaint."  Khoja, 899 F.3d at 1002.

Here, defendants ask the court to take judicial notice of multiple documents, audio recordings, and videos, including: (1) Redding Police Department Incident Report No. RPD23-037076 (Exhibit A); (2) City of Redding Claim for Money or Damages, dated February 29, 2024 (Exhibit B); (3) Notice of Rejection of Claim from City of Redding, dated March 24, 2024 (Exhibit C); (4) several sections of the California Vehicle Code and the California Penal Code (Exhibits D-L); (5) thirty-eight SHASCOM audio recordings of the November 4, 2023, traffic stop and subsequent arrest of plaintiff, provided to the court and plaintiff via a USB flash drive; and (6) seven Police Bodycam Videos, obtained from Redding Police Department Officers Carnahan, Rabon, Arnold, Dahnke, Guterding, and Upshaw, as well as Corporal Townsley, all recorded on November 4, 2023, during the traffic stop and subsequent arrest of plaintiff, provided to the court and plaintiff via a USB flash drive.  ECF No. 23 at 2-3.

The court finds that all of the document and recordings are subject to judicial notice for the fact of their existence, though not for the truth of any facts which they may contain.  The court grants the request for judicial notice insofar as the existence of each of these documents and recordings is deemed noticed.  The police reports, videos, and recordings are not judicially noticeable for the truth of facts they contain.

3.  Incorporation by Reference

Defendants also invoke the incorporation by reference doctrine.  ECF No. 23 at 5. "[W]ithin the Ninth Circuit, district courts are split on whether the incorporation-by-reference doctrine allows a court to consider an officer's body-camera video in a Rule 12 motion."  Lee v. City of San Diego, No. 18-cv-0159 W (BLM), 2019 WL 117775, at *4 (S.D. Cal. Jan. 7, 2019). In Lee, the district court reasoned that the Ninth Circuit's Khoja decision, referenced above, clarifies that when it comes to incorporation of video or audio recordings of an incident at issue in a complaint, it is not enough that the video or audio provide an understanding of the incident at issue.  Instead, "the doctrine requires the complaint to refer to the material or that plaintiff's claims are *based* on the material."  Lee, No. 2019 WL 117775, at *4 (emphasis original).  The complaint in Lee was based on events surrounding the plaintiff's arrest, but did not refer to body

///

7

1  camera videos, and accordingly the court did not incorporate the videos by reference.  The

2  circumstances are very different in the case now before this court.

3      The operative First Amended Complaint presents a relatively unique situation in the

4  experience of the undersigned, because it repeatedly and extensively refers to and relies upon the

5  officers' body camera footage and related audio recordings.  The following is a non-exhaustive

6  sample of plaintiff's specific references to the video recordings in the First Amended Complaint

7  (ECF No. 5), by page and line number: 2:23 ("In reviewing video, and audio evidence the

8  Officer's Dahnke, Upshaw, Townelsy are being witnessed Verbally threatened to use Excessive

9  force . . ."); 3:1 ("Video Evidence shows . . ."); 3:9 ("Officer Upshaw, who was caught on his

10  own axon body camera video . . ."); 3:12 ("Plaintiff identified himself to both officers by name as

11  documented on body camera"); 3:22 ("Officer can be heard on video (face concealed) mentioning

12  . . ."); 4:25 ("documented on camera, the officers . . . knocking plaintiffs phone out of plaintiffs

13  right hand, breaking plaintiffs arm . . ."); 5:13 ("Body Camera shows Officers . . . pulling Plaintiff

14  over in a dark secluded area . . .").

15      Plaintiff not only acknowledges the existence of the body camera footage, but he also

16  repeatedly invokes the videos *as documentation of* his factual allegations.  On these specific facts,

17  the court concludes that the seven Police Bodycam Videos, obtained from Redding Police

18  Department Officers Carnahan, Rabon, Arnold, Dahnke, Guterding, and Upshaw, as well as

19  Corporal Townsley, all recorded on November 4, 2023, during the traffic stop and subsequent

20  arrest of plaintiff, are subject to the doctrine of incorporation by reference.  This body camera

21  footage has therefore been reviewed for purposes of the motion to dismiss, and the contents of the

22  recordings is deemed incorporated into the First Amended Complaint.

23      B.  Bane Act Claim

24      "The Tom Bane Civil Rights Act, 1987 Cal. Stat. 4544, was enacted in 1987 to address

25  hate crimes. The Bane Act civilly protects individuals from conduct aimed at interfering with

26  rights that are secured by federal or state law, where the interference is carried out by threats,

27  intimidation or coercion."  Reese v. County of Sacramento, 888 F.3d 1030, 1040 (9th Cir. 2018)

28  (internal quotations omitted).  To support a Bane Act claim, a plaintiff must allege facts that show

1    the defendant had a "specific intent" to violate plaintiff's constitutional rights.  Sandoval v.

2    County of Sonoma, 912 F.3d 509, 520 (9th Cir. 2018).  To determine whether a defendant acted

3    with specific intent, the court looks at two factors: First, "[i]s the right at issue clearly delineated

4    and plainly applicable under the circumstances of the case," and second, "[d]id the defendant

5    commit the act in question with the particular purpose of depriving the citizen victim of his

6    enjoyment of the interests protected by that right?"  Cornell v. City & County of San Francisco,

7    17 Cal. App. 5th 766, 804 (2017), as modified (Nov. 17, 2017).

8          Here, plaintiff asserts that the "video, and audio evidence of the Officer's Dahnke,

9    Upshaw, Townsley are being witness Verbally threatened to use Excessive force beyond what is

10   necessary on plaintiff to pull him out of his vehicle" rather than verbally asking plaintiff to step

11   out of the vehicle.  ECF No. 5 at 2-3.   The court has reviewed the video.  After a lengthy

12   exchange between plaintiff and the officers during which the officers asked plaintiff to identify

13   himself and plaintiff refused, the officer speaking with plaintiff says "so that's where we're at.

14   I'm going to give you the option to either identify yourself or you're going to have to get out of

15   the car."  AXON Body4 D01A08103 at 10:50. The officer then opens the car door and instructs

16   plaintiff to put his hands on his head, which plaintiff does not do.  Id. at 11:00.   Two officers then

17   reached in the vehicle, taking plaintiff by the arms, and pull him out of the car and onto the floor,

18   where he is restrained and handcuffed.  11:40.  As the handcuffs are being placed on him,

19   plaintiff says "my arms and shit are fucking broken."  Id.  The video that plaintiff cites in his

20   complaint does not align with plaintiff's assertion that the officers verbally stated that they

21   intended to use excessive force beyond what was necessary.  Because plaintiff's only basis for a

22   Bane Act claim was the verbal declaration of intent to violate plaintiff's rights, which is belied by

23   the very video plaintiff relies upon, this claim must be dismissed without leave to amend because

24   plaintiff does not and cannot state a claim upon which relief can be granted.

25          C.  Plaintiff's Constitutional Claims

26          Plaintiff asserts claims for constitutional violations pursuant to 42 U.S.C. § 1983, which

27   "is a method for vindicating federal rights elsewhere conferred."  Albright v. Oliver, 510 U.S.

28   266, 271 (1994).  To state a claim under §1983, a plaintiff must allege facts from which it may be

9

1   inferred (1) he was deprived of a federal right, and (2) a person or entity who committed the

2   alleged violation acted under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988);

3   Williams v. Gorton, 529 F.2d 668, 670 (9th Cir. 1976).  A plaintiff must identify a specific injury

4   was suffered and show a causal relationship between the defendant's conduct and the injury. See

5   Rizzo v. Goode, 423 U.S. 362, 371-72 (1976).  An individual deprives another of a federal right

6   "if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act

7   which he is legally required to do so that it causes the deprivation of which complaint is made."

8   Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).  Each of plaintiff's constitutional claims is

9   addressed below.

10                    1.  Plaintiff Does Not State a First Amendment Claim

11          Plaintiff's First Amendment claim is based on his contention that he was unlawfully

12   prevented from photographing or videotaping the police during his interaction with them.  ECF

13   No. 5 at 4.  Defendants move to dismiss, asserting that plaintiff does not have a viable cause of

14   action.  ECF No. 15-1 at 5.  Defendants further assert leave to amend is not warranted because the

15   officer defendants have qualified immunity. Id. at 9.  Government officials are immune "from

16   liability for civil damages insofar as their conduct does not violate clearly established statutory or

17   constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457

18   U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold

19   public officials accountable when they exercise power irresponsibly and the need to shield

20   officials from harassment, distraction, and liability when they perform their duties reasonably."

21   Pearson v. Callahan, 555 U.S. 223, 231 (2009).  Ideally, qualified immunity is determined at the

22   earliest possible stage in litigation to avoid unnecessary burden and expense. Hunter v. Bryant,

23   502 U.S. 224, 227 (1991).

24          Federal law has long been clear that there is a First Amendment Right to photograph and

25   record "matters of public interest," including interactions with police officers in public spaces.

26   Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995); Askins v. U.S. Dep't of Homeland

27   Sec., 899 F.3d 1035, 1044 (9th Cir. 2018); see also, Reed v. Lieurance, 863 F.3d 1196, 1211 (9th

28   Cir. 2017) (referencing "the First Amendment-protected activity of observing a government

                                                    10

1  operation" and citing <u>Fordyce</u> as "recognizing a 'First Amendment right to film matters of public

2  interest' – in that case, police actions during a public demonstration" (quoting <u>Fordyce</u>, 55 F.3d at

3  439)).  However, the established law regarding the right to record police interactions addresses

4  the rights of journalists, observers and bystanders—it does not recognize or directly address the

5  right of an individual to record while detained.

6          The facts related to the removal of plaintiff's phone in the complaint are somewhat

7  unclear and are inconsistent with the body camera footage.  Regardless, it is clear that plaintiff

8  was detained by the officers during the period at issue.  As this court explained in detail in <u>Alston</u>

9  <u>v. City of Sacramento</u>, No. 2:21-cv-2049 DAD AC PS, 2023 WL 6626174, at *11, 2023 U.S.

10  Dist. LEXIS 182975 (E.D. Cal. Oct. 11, 2023), <u>report and recommendation adopted</u>, No. 2:21-cv-

11  2049-DAD-AC-PS, 2024 WL 733260 (E.D. Cal. Feb. 22, 2024), there is not a clearly established

12  right for a detained person to videotape or photograph police while actively detained.  This is

13  because the First Amendment is subject to "time, place and manner restrictions" on otherwise

14  protected First Amendment activity.  <u>See</u> <u>Askins</u>, 899 F.3d at 1044.  For example, in <u>Kelly v.</u>

15  <u>Borough of Carlisle</u>, the Third Circuit found that there is not a clearly established right for a

16  person to videotape police while they are pulled over on a traffic stop, because traffic stops have

17  been characterized as an "inherently dangerous situation."  622 F.3d 248, 262 (3rd Cir. 2010).

18  The <u>Kelly</u> court noted that the right to videotape police "is subject to reasonable time, place, and

19  manner restrictions, as long as they are 'justified without reference to the content of the regulated

20  speech, ... are narrowly tailored to serve a significant governmental interest, and ... leave open

21  ample alternative channels for communication of the information."  <u>Id.</u> (quoting <u>Ward v. Rock</u>

22  <u>Against Racism</u>, 491 U.S. 781, 791 (1989)).

23          Assuming that the Officers did prevent plaintiff from filming as he alleges,[1]  the

24  _____

25  [1] It appears from the video footage cited by plaintiff that he was actually allowed to record the entire encounter with the officers.  At AXON BODY 4 D01A07333, plaintiff is debating with the

26  officers, and says "that would be considered racial profiling, and that's exactly why I'm filming this video . . . I'm filming this because . . .," and Officer Dahnke replies, "that's fine, we're

27  filming it too."  5:00-5:06.  Another officer is heard stating, "you're free to record" and Officer Dahnke says, "we're happy to have that."  Later in the encounter, at 7:08 in the video footage,

28  plaintiff aims the camera at Dahnke with the phone light on, and Officer Dahnke says, "please put

1    undersigned is skeptical of plaintiff's assertion that he had a First Amendment right to record

2    while being actively detained and questioned by police.  However, this court need not decide that

3    question because it is apparent that the officer defendants are entitled to qualified immunity.

4    There was, at the time of plaintiff's detention, no "clearly established" First Amendment right for

5    a person being detained for investigatory purposes to personally record his own detention.

6    Accordingly, the defendants are immune from liability   See Mullenix v. Luna, 577 U.S. 7, 13

7    (2015) (a right is not clearly established for qualified immunity purposes unless existing

8    precedent "squarely governs" the specific facts at issue).  Accordingly, the court agrees with

9    defendants that this claim must be dismissed without leave to amend.

10                    2.  Plaintiff Does Not State a Fourth Amendment Claim

11         Plaintiff's Fourth Amendment claim alleges three distinct violations: (1) unlawful stop,

12   detention, and arrest; (2) use of excessive force; and (3) unlawful seizure of property.  ECF No. 5

13   at 5-10.  Each is addressed in turn.

14                         a.  Unlawful Stop, Detention, and Arrest

15         Plaintiff alleges that defendants violated the Fourth Amendment by unlawfully stopping

16   him on a "hunch" that he was driving without a front plate.  Plaintiff agues this "hunch" was

17   manufactured to give the appearance of probable cause.  ECF No. 5 at 5-6.  Plaintiff continues

18   with a narrative explanation of the encounter, but the thrust of the claim is that defendants

19   initiated an unlawful traffic stop without probable cause.  Id.  The Fourth Amendment prohibits

20   unreasonable searches and seizures by the government. U.S. Const. amend. IV. "The Fourth

21   Amendment 'applies to all seizures of the person, including seizures that involve only a brief

22   detention short of traditional arrest.'"  United States v. Montero-Camargo, 208 F.3d 1122, 1129

23   (9th Cir. 2000) (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975)).  "In order to

24   satisfy the Fourth Amendment's strictures, an investigatory stop by the police may be made only

25   if the officer in question has 'a reasonable suspicion [or probable cause] supported by articulable

26   facts that criminal activity may be afoot[.]'"  Montero-Camargo, 208 F.3d at 1129 (quoting

27   _____

28   the phone down."  However, it is not clear that plaintiff turned off the camera when he lowered it,
     and it does not appear that plaintiff was ever instructed to stop recording.

1   United States v. Sokolow, 490 U.S. 1, 7 (1989)).  "A traffic violation alone is sufficient to

2   establish reasonable suspicion."  United States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir. 2006).

3         Police may conduct traffic stops based on "individualized reasonable suspicion or

4   probable cause of unlawful conduct."  Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir.

5   2014)(internal citations omitted).  To determine whether the officers had "reasonable suspicion"

6   or "probable cause" to initiate the traffic stop is an "objective" inquiry, concerned only with

7   whether the stop was "objectively reasonable" under the circumstances.  Ornelas v. United States,

8   517 U.S. 690, 696 (1996).  Courts may not delve into "concerns about improper motives and

9   pretext" to invalidate otherwise lawful stops supported by reasonable suspicion or probable cause.

10  Ashcroft v. al-Kidd, 563 U.S. 731, 739 (2011) (citations omitted).  The probable cause inquiry

11  does not depend on whether the officer was ultimately correct about their belief that a violation of

12  the law was occurring.  "Officers can have reasonable, but mistaken, beliefs as to the facts

13  establishing the existence of probable cause or exigent circumstances, for example, and in those

14  situations courts will not hold that they have violated the Constitution."  Saucier v. Katz, 533 U.S.

15  194, 206 (2001).

16        Here, AXON BODY 4 D01A07333 shows plaintiff being pulled over by Officer Dahnke,

17  who can be heard saying, "Hello! Hey, Reding Police Department, I pulled you over because you

18  don't have a front plate on your car."  Plaintiff responded, "it probably fell off, its probably on the

19  road somewhere."  Id. at 1:14.  Officer Dahnke states she will "take a peek again" and says, "well

20  it is on there, it's just not visible, that's my mistake there."  Id. at 1:20.  She then states, "do you

21  mind if I just look at your drivers license and then I'll get out of here."  Id.  Another officer can

22  be heard saying "it looks like you got illegally tinted windows too" to which plaintiff responds

23  the tints are legal, and he believes he is being racially profiled.  Id. at 1:45. After some back and

24  forth, plaintiff states "the license plate is visible because the headlight's on."  Id. at 3:20.

25        The officers continue to explain that the other reason for probable cause is that the

26  windows are tinted, citing §26708 of the California Vehicle Code, and plaintiff disputes that he is

27  responsible for the tint because that is the way the car came from the dealer.  Id.  A verbal

28  exchange about the legality of and responsibility for the tint ensues.  Officer Dahnke says, "Sir,

1    I'm not even asking you to search the vehicle." 5:44.  After some further back and forth, plaintiff

2    says "I'm from Baltimore, Maryland."  Id. at 6:00.  An officer then asks plaintiff if his name is

3    "Michael Smith" and plaintiff states "I'm not going to give you guys any more information."  Id.

4    at 6:07.

5          After more conversation, Officer Dahnke says "Sir, you must legally identify yourself."

6    Id. at 6:50.  Officer Dahnke continues to ask plaintiff if his name is Michael.  Id. at 9:55.  Officer

7    Dahnke says, "All you have to do is identify yourself.  I'm done arguing, and I'm going to have

8    to pull you out of the car to detain you.  I do not want to do that.  But I have to identify you."  Id.

9    at 10:20-10:33.  Plaintiff again says, "I don't have to provide any identification."  Id. at 10:50.

10   Plaintiff is again asked if he is Michael Smith from Maryland and he responds, "that's not my

11   name." 11:00-11:02.  Plaintiff demands a supervisor, and Officer Dahnke explains that one has

12   already been called and is on his way.  11:40.  The supervisor then approaches the window and

13   tells the plaintiff that it appears his "ID expired in 2002." 13:27.  The supervisor continues to ask

14   plaintiff to identify himself and tells plaintiff that per state law plaintiff is required to identify

15   himself, explaining that "if you are an active felon and I let you go" then there is a problem.

16   17:16.  Plaintiff continues to refuse to identify himself.  The officer states, "See, this behavior

17   makes us think you're trying to hide something," and continues to ask for identification so that

18   plaintiff can go on his way.  Id. at 17:50.

19         Plaintiff and the supervising officer continue to discuss whether there was probable cause

20   for plaintiff to be pulled over.  The supervising officer goes to look at the front plate and notes

21   there is spray paint on it, which may have been the reason the plate was not initially visible to

22   Officer Dahnke.  Id. at 19:50.  Plaintiff explains that there was spray paint there because he

23   spraypainted his car.  Id.  The supervising officer explained "if it's nonreflective, they can't see

24   anything."  Id. at 20:02.  The supervising officer again stated that he would like to get plaintiff

25   "out of here as soon as possible" but they first needed him to confirm his identification.  Id. at

26   20:18.  After continued back and forth, the officer again says, "show us your ID and we'll let you

27   go about your business."  Id. at 21:25.  After continued discussion during which plaintiff refused

28   to identify himself, he was instructed that he must either identify himself or he was going to be

14

1  arrested.  Id. at 22:50.  At 23:38 on the AXIOM camera, the supervising officer open's plaintiff's

2  door to initiate the arrest process.

3       It is clear from the facts presented in the complaint and from the incorporated body

4  camera footage that there was probable cause for both the initial stop and the arrest.  Indeed,

5  without looking to the incorporated camera footage, plaintiff's complaint states that Officer

6  Dahnke identified the missing front plate as the reason for the stop, stating "Officer Dahnke

7  walked based on a hunch plaintiff was driving without a front plate."  ECF No. 5 at 5.  Again,

8  even if Officer Dahnke was ultimately wrong and plaintiff did have a front plate, probable cause

9  does not depend on the Officer being ultimately correct so long as the belief was reasonable under

10 the circumstances.  Saucier, 533 U.S. at 206.  Plaintiff's conclusory argument that the asserted

11 probable cause was a pretext for racial profiling does not undermine this conclusion.

12      As to the detention and arrest, the facts also clearly demonstrate probable cause.  "When

13 stopping an individual for a minor traffic violation, 'an officer's mission includes ordinary

14 inquiries incident to the traffic stop.'"  United States v. Evans, 786 F.3d 779, 786 (9th Cir. 2015).

15 (quoting Rodriguez v. United States, 575 U.S. 348, 354 (2015)).  These involve "checking the

16 driver's license, determining whether there are outstanding warrants against the driver, and

17 inspecting the automobile's registration and proof of insurance," and each share "the same

18 objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely

19 and responsibly."  Rodriguez, 575 U.S. at 354.  Here, the officers acted reasonably and within the

20 bounds of an ordinary traffic stop in asking plaintiff, the driver of the vehicle, to identify himself.

21 Plaintiff's prolonged refusal to do so added probable cause in support of detention and arrest: the

22 officers repeatedly told him that his behavior indicated he was trying to hide something, and that

23 if he would just identify himself, he would be free to go.  Because there was clear probable cause

24 for the officers to stop, detain, and ultimately arrest plaintiff, plaintiff does not and cannot state a

25 Fourth Amendment claim on these bases.  Accordingly, the claim should be dismissed without

26 leave to amend.

27 ///

28 ///

15

b. Excessive Force

Plaintiff's complaint states "it is documented on video plaintiff's vehicle was completely shut off, hands on the steering wheel recording the interaction with the supervisor, 10 minutes past, video shows the supervisor Opening Plaintiffs car door, as 4 cops rush plaintiff's vehicle (swat style), using Excessive Force by participant Officer Upshaw, Chase Arnold, Gutering in pulling Plaintiff out of his vehicle . . . using more force than necessary to apprehend Plaintiff[.]" ECF No. 5 at 8. The Fourth Amendment requires that "all force—lethal and non-lethal—must be justified by the need for the specific level of force employed." Bryan v. MacPherson, 630 F.3d 805, 825 (9th Cir. 2010). "To determine the objective reasonableness of a particular use of force is a three-step inquiry." Garlick v. County of Kern, 167 F. Supp. 3d 1117, 1144 (E.D. Cal. 2016), (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). First, courts assess the "quantum of force used" by considering the "type and amount of force inflicted." Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). Second, the court looks to the government's countervailing interests at stake. Graham, 490 U.S at 396. Third and finally, the court must "weigh in balance" whether the degree of force used was warranted by the government interest at stake. Id.

Here, the complaint on its face does not provide enough facts to state an excessive force claim. It relies on the conclusory statement that the officers used more force than was reasonably necessary, without giving details as to precisely what type of force was used by whom or explaining how it was excessive. ECF No. 5 at 8. Plaintiff alleges that he was "pull[ed]" from the car, which may be sufficient to allege that force was used but is not sufficient to support an inference the force was more than what was necessary under the circumstances. This would be reason enough to dismiss the claim, perhaps with leave to amend, but plaintiff has specifically relied on and incorporated video footage that plainly shows no excessive force was used. Accordingly, plaintiff cannot state a claim upon which relief can be granted.

With respect to use of force, the relevant footage at AXON BODY 401A07333 begins with the supervising officer opening plaintiff' door at 23:35, and then stepping off to the side with his back against the door. Plaintiff is then instructed to put his hands on his head, and plaintiff is

16

1  seen leaning further into the vehicle toward the passenger side.  Id. at 23:42. Two officers

2  standing next to the vehicle and plaintiff's open door reach in and grab one of plaintiff's arms and

3  the supervising officer takes plaintiff's other arm, and they place plaintiff onto the ground as he

4  says, "get off me."  Plaintiff's hands are placed behind his back while plaintiff is on the ground

5  struggling.  As plaintiff is being restrained at each leg and handcuffed, he states "I was injured in

6  Iraq and shit, my arms and shit are fucking broken and y'all aggravating my shit even more."  Id.

7  at 24:15.  Plaintiff is assisted off the ground and walked towards the police car and is told to

8  separate his feet.  Id. at 25:00.  The officers examine plaintiff's handcuffs and identify that one is

9  latched tightly.  Id. at 25:14.  Officers Upshaw and Dahnke loosen the cuff.  Id. at 25:33.

10      Plaintiff is standing and does not appear in any physical distress as he continues to

11  challenge the officers' probable cause.  Id.  At 25:35, Officer Upshaw instructs plaintiff to open

12  his hands, and plaintiff says "you guys are squeezing the shit out of my fucking arms" to which

13  Officer Upshaw replies that they are in the process of adjusting the handcuffs.  Officer Upshaw

14  sates, "There, I can put three fingers inside of that handcuff."  Id.  Plaintiff is instructed to widen

15  his stance and responds "my feet are spread as far as they are going to go!  I have a broken foot!"

16  Id. at 27:00.  Plaintiff is escorted to the back of the police car, is seated and seat belted without

17  incident, and the window is rolled down for him.  Id. at 28:00-29:34.

18      Due to plaintiff's complaints that he had broken his leg and his foot, he is taken to the

19  hospital.  Id. at 41:10. Plaintiff states, "I said my foot was broken from me serving in Iraq."  Id. at

20  41:15.  He states he is "disabled from head to toe."  Id.  Plaintiff gets out of the vehicle on his

21  own and is walked down to hospital registration by the officers.  Id.  Officer Dahnke is heard

22  saying to hospital personnel, "We're here for a medical clearance.  There were no control holds

23  but he's complaining of, he said in the past . . .we're just making sure he's physically ok . . . it's

24  all old stuff."  Id. at 42:00-42:28.  Plaintiff's face is visible on the video, there are no obvious

25  injuries, and he does not appear to be in any acute physical distress.  Id. at 43:48.  Plaintiff asks

26  for his left knee to be photographed and instructs Officer Dahnke to roll up his pant leg.  Id. at

27  44:10.  Officer Dahnke does so and reveals a small abrasion on plaintiff's knee.  Id. at 44:38.

28  ///

17

The video on which plaintiff relies in his complaint undermines his claim that the force used was objectively excessive. As to the first factor, the court notes that force was not initiated with plaintiff until more than 20 minutes into the encounter during which he was repeatedly warned that if he did not identify himself, he would be arrested. When force was initiated, plaintiff did not immediately follow the officers' instruction to place his hands on his head and was therefore removed from a seated position in his vehicle directly on to the ground: a distance of not more than a few feet. As plaintiff struggled, he was physically restrained. As soon as handcuffs were placed, plaintiff was stood up and he walked, escorted, to the police vehicle. The totality of the circumstances demonstrate that minimal force was used, and the force that was used was objectively reasonable in light of plaintiff's resistance to the investigation. Accordingly, the undersigned concludes the claim should be dismissed without leave to amend.

c.  Unlawful Seizure

Plaintiff alleges that "documented on video, and screenshot captured shows the same officer Upshaw unlawfully seizing (theft of property) the Plaintiff's only car key, removing it from the key chain that contained Plaintiffs house keys, and intentionally threw them onto the ground as gathered as video evidence, the officer intentionally did perform this act out of malice, as a means to deprive the Plaintiff's permanently of his vehicle during the time it was being unlawfully impounded, and towed." ECF No. 5 at 8-9. "While taking and destroying personal property is a seizure . . . such seizures are only unlawful if they are unreasonable. To assess reasonableness, courts must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Lavan v. City of Los Angeles, 797 F. Supp. 2d 1005, 1013 (C.D. Cal. 2011) (internal citations omitted).

Plaintiff specifically invokes video footage of Officer Upshaw, who was in the police vehicle that initiated the traffic stop with Officer Dahnke. ECF No. 5 at 8. Body camera footage at D01A06303 shows the inventory search of plaintiff's vehicle. At 12:30, an officer can be seen taking a key ring with multiple keys and keychains from inside plaintiff's car. The officer looks at the keys, removes one key, which appears to be a car key, and another item from the ring.

18

1     While holding the items, he walks toward the trunk of the car and looks at it.  Id. at 12:45.  The

2     officer then asks another officer, "do you see a trunk release over there?"  The officer walks back

3     to the passenger side of the car and drops what appears to be a keyless entry car remote on the

4     passenger seat.  Id. at 13:10.  He then drops what appears to be the removed car key on the

5     passenger seat as well.  Id.  at 13:23.  With those items resting in the front seat of the car, the

6     officer goes back to inspect the trunk.  Id. at 13:40.  The video does not show any officer

7     throwing the keys on the floor.

8          AXON BODY D01A08103 provides another angle of the vehicle inventory search: from

9     the drivers' side, an officer's arm is shown reaching over from the open passenger side door to

10    take the keys out of the ignition at 13:50.  A few second later, the officer with the keys can be

11    seen, viewed from across the car, holding up the key ring and looking at the keys and twisting an

12    item or two off the ring.  From this angle, it appears the officer drops the keys in a downward

13    direction, and then walks to the back of the vehicle.  When he returns, he reaches into the

14    passenger seat with the keys.  At no time does an officer throw the keys on the floor.  The video

15    shows plaintiff's keys were placed in the vehicle.  Because this claim is based only on facts that

16    are undercut by the incorporated video on which plaintiff relies, the court concludes that plaintiff

17    cannot state a claim upon which relief can be granted, and that this claim should be dismissed.

18               3.  Plaintiff Does Not State a Fifth Amendment Claim

19         Plaintiff asserts that his Fifth Amendment rights were violated, as shown in video and

20    audio, when officers pulled him out of his vehicle and detained him for refusing to identify

21    himself.  ECF No. 5 at 10.  The Fifth Amendment provides that "[n]o person … shall be

22    compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  This

23    court need not determine whether plaintiff had a Fifth Amendment right not to provide his name

24    to the officers—a highly dubious proposition.[2]  The Ninth Circuit has squarely held that a Fifth

25    _____

26    [2] The Supreme Court has long recognized that questions about identity are a permissible part of
      routine investigative stops.  See United States v. Hensley, 469 U.S. 221, 229 (1985); Hayes v.

27    Florida, 470 U.S. 811, 816 (1985).  State laws requiring individuals who are stopped for
      questioning to provide identification to the police violate neither the Fourth nor Fifth

28    Amendments.  Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 187-188, 190-191 (2004).  The
      Fifth Amendment protects disclosure of identity only in "unusual circumstances" in which the

1    Amendment violation will not support a Section 1983 claim unless the plaintiff made a statement

2    that was used against him in a criminal proceeding.  Chavez v. Robinson, 12 F.4th 978, 999 (9th

3    Cir. 2021).  There are no allegations here that any of plaintiff's statements have been used against

4    him.  The video evidence that plaintiff invokes shows plaintiff voluntarily speaking with police

5    throughout the interaction, while refusing to identify himself.  There are no facts in the complaint

6    that can give rise to any plausible Fifth Amendment claim.  This claim should be dismissed.

7                    4.  Plaintiff Does Not State a Fourteenth Amendment Claim

8            Plaintiff argues that his Fourteenth Amendment rights were violated because he was

9    racially targeted, and the police have stopped him on more than 5-7 occasions for the sole purpose

10   of identifying him.  ECF No. 5 at 12.  Plaintiff states that the Racial and Identity Profiling

11   Advisory Board has identified uninvestigated complaints of racial profiling against the Redding

12   Police Department.  Id. at 13.  Plaintiff alleges his race was intentionally concealed from police

13   reports so that the officers could hide their racial profiling.  Id.  Plaintiff alleges there were

14   several prior interactions between himself and police which reflect a racially discriminatory

15   pattern: (1) on April 7, 2023 officers followed him home and night and ran his license plates

16   before leaving when the officer noticed he was recording; (2) on March 21, 2023, an officer saw

17   plaintiff trying to get gas and asked plaintiff to identify himself, but then the officers refused to

18   identify themselves so plaintiff could make a complaint; (3) on January 17, 2024 plaintiff was

19   being followed by police for about 20 minutes before the police car switched lands and drove

20   away; and (4) on February 8, 2024, plaintiff was followed by officers until he parked.  The

21   officers parked nearby and asked a Caucasian woman sitting at a bus stop of plaintiff tried to sell

22   her drugs or harass her, and then followed him in his car again until eventually driving away.  Id.

23   at 14-16.

24           The Fourteenth Amendment provides no state shall "deny to any person within its

25   jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  "Proof of racially

26   discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."

27   _____

28   name itself has incriminating potential beyond the scope of the stop.  Id. at 190-191.

1   <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 265 (1977).  A plaintiff

2   need not show "the challenged action rested solely on racially discriminatory purposes."  <u>Id.</u>

3   Instead, a plaintiff must show the discriminatory purpose was a "motivating factor" for the

4   challenged action.  <u>Id.</u> at 265–66.  "Racial profiling can constitute a deprivation of a citizen's

5   right to equal protection under the law."  <u>James v. City of Seattle</u>, 2011 WL 6150567 at *13

6   (W.D. Wash. Dec. 12, 2011); <u>see also</u> <u>Whren v. United States</u>, 517 U.S. 806 (1996) (holding that

7   claims asserting selective enforcement of the law based on considerations such as race are

8   properly brought under the Equal Protection Clause).  To state a claim for racial profiling in

9   violation of the Equal Protection Clause, "a plaintiff must show that the defendants acted with an

10  intent or purpose to discriminate against the plaintiff based on membership in a protected class."

11  <u>Thornton v. City of St. Helens</u>, 425 F.3d 1158, 1166-67 (9th Cir. 2005) (citation and quotations

12  omitted).

13      The allegations in the complaint and the video cited by and relied upon by plaintiff in the

14  complaint are not sufficient to establish a Fourteenth Amendment violation.  Plaintiff must

15  provide more than conclusory assertions that he was pulled over on the basis of his race.  As set

16  forth above, the officers repeatedly state in the video footage that plaintiff was pulled over for a

17  missing front plate.  They also explain that they could not have pulled him over on the basis of his

18  race because it was dark out and plaintiff's windows were tinted, so they could not see inside the

19  vehicle when they were pulling him over.  AXON BODY 4 D01A07333 at 13:07.  Plaintiff does

20  not plausibly allege that the officers "acted with an intent or purpose" to discriminate against him.

21  Accordingly, this claim must be dismissed.

22              5.  <u>Plaintiff Does Not State a Municipal Liability Claim</u>

23      A municipality or government entity, like the Redding Police Department, cannot be held

24  liable for claims brought under 42 U.S.C. §1983 based on respondeat superior or any other theory

25  of vicarious liability.  <u>Board of County Com'rs of Bryan County, Oklahoma v. Brown</u>, 520 U.S.

26  397, 403 (1997) (no vicarious liability under § 1983).  Municipal liability is therefore limited to

27  harms caused by an official municipal policy, or a custom or practice of the entity that has the

28  force of policy.  <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 690-91 (1978).

1    Plaintiff must plead and ultimately prove that he suffered a constitutional injury that was caused

2    by the offending municipal policy.  Connick v. Thompson, 563 U.S. 51, 60-61 (2011).

3         Here, plaintiff's generalized allegations of illegal conduct are insufficient to state a claim

4    that the Redding Police Department maintained an official policy, custom, or practice that

5    violated plaintiff's constitutional rights.  Further, because plaintiff has not stated a claim that any

6    of his constitutional rights were violated at all, it is clear he cannot state a Monell claim.

7    Accordingly, any Monell claim must be dismissed.

8         D.    Plaintiff Does Not State an ADA or Rehabilitation Act Claim

9         Plaintiff alleges his rights under Americans with Disabilities Act and the Rehabilitation

10   Act were violated when plaintiff, as "seen on the video footage, audio, and camera footage the

11   Plaintiff had assisted walking device in my right hand the officers knocked it out of my right

12   hand, with my phone as it was recording as I was prepared to exit my vehicle the officers

13   proceeded to yank my arm slightly out of my socket and with force while executing a breaking in

14   my elbow."  Plaintiff alleges he "informed them 'I needed my cane as an accommodation but they

15   did not listen."  ECF No. 5 at 18-20.  Plaintiff also alleges the officers refused to get him medical

16   treatment after he informed them that he had broken his arm.  Id. at 18.  The video incorporated

17   by plaintiff is set forth in detail above.  It does not show officers knocking plaintiff's cane out of

18   his hand.  It does show that plaintiff was driven directly to the hospital after he was arrested.

19        Title II of the ADA prohibits a public entity from discriminating against a qualified

20   individual with a disability on the basis of that disability.  42 U.S.C. § 12132; Weinreich v. L.A.

21   County Metro. Transp. Auth., 114 F.3d 976, 978 (9th Cir. 1997).  As "[t]here is no significant

22   difference in analysis of the rights and obligations created by the ADA and the Rehabilitation

23   Act," the Court analyzes these claims simultaneously.  Zukle v. Regents of Univ. of Cal., 166

24   F.3d 1041, 1045 (9th Cir.1999).  Consistent with "the majority of circuits to have addressed the

25   question," the Ninth Circuit has held "that Title II applies to arrests."  Sheehan v. City and

26   County of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014).  "The Ninth Circuit recognized

27   two types of ADA claims applicable to arrests: (1) wrongful arrest, where police wrongly arrest

28   someone with a disability because they misperceive the effects of that disability as criminal

22

1   activity, and (2) reasonable accommodation, where police fail to reasonably accommodate the

2   person's disability in the course of investigation or arrest, causing the person to suffer greater

3   injury or indignity in that process than other arrestees." Bresaz v. County of Santa Clara, 136 F.

4   Supp. 3d 1125, 1132 (N.D. Cal. 2015) (internal citations omitted). The allegations in plaintiff's

5   complaint, including the facts shown by the video incorporated into the complaint, clearly

6   demonstrate that plaintiff cannot state an ADA claim or a Rehabilitation Act claim. These claims

7   must be dismissed.

### III.    Leave to Amend Is Not Appropriate

9       Leave to amend is not appropriate in this case. Ordinarily, pro se litigants are granted

10   liberal leave to amend. "Valid reasons for denying leave to amend include undue delay, bad faith,

11   prejudice, and futility." California Architectural Bldg. Prod. v. Franciscan Ceramics, 818 F.2d

12   1466, 1472 (9th Cir. 1988). Here, given the facts alleged and the incorporation of video evidence

13   into the complaint, it is clear that there are no additional facts that plaintiff can allege in order to

14   sufficiently support any of his legal claims. The undersigned finds that leave to amend would be

15   futile and should therefore not be granted.

### IV.    Pro Se Plaintiff's Summary

17       It is recommended that your case be dismissed because the facts of your case, taken from

18   the complaint and the videos that you rely on in your complaint, show that you cannot satisfy the

19   elements of any of your legal claims. The magistrate judge is therefore recommending that you

20   not be given further leave to amend. If you disagree with this recommendation, you may file

21   objections for the district judge to consider within 21 days. The district judge will make the final

22   decision.

### V.  Conclusion

24       Accordingly, the undersigned recommends that defendants' motion to dismiss (ECF No.

25   15) be GRANTED and that this case be DISMISSED and closed.

26       These findings and recommendations are submitted to the United States District Judge

27   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days

28   after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Id.; see also Local Rule 304(b).  Such a

document should be captioned "Objections to Magistrate Judge's Findings and

Recommendations."  Failure to file objections within the specified time may waive the right to

appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez

v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED:  April 3, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE